UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO: 2:15-cr-70-FtM-29MRM

CHARLES J. PEDOTO
_____/

## REPORT AND RECOMMENDATION

Pending before the Court is Defendant Charles J. Pedoto's Motion to Dismiss the

Indictment (Doc. 98) filed on May 5, 2017. The Government fled a response (Doc. 106) on May

19, 2017. On May 24, 2017, the Honorable John E. Steele referred Defendant's Motion to the

Undersigned "for an evidentiary hearing and issuance of a report and recommendation." (Doc.

107 at 1). The Undersigned conducted an evidentiary hearing on June 23, 2017.[1] This matter is

ripe for review. For the reasons set out herein, the Undersigned respectfully recommends that

Defendant Charles J. Pedoto's Motion to Dismiss the Indictment (Doc. 98) be **DENIED**.

## I.  Evidence

The Government called nine witnesses at the hearing:  (1) Special Agent John Thurling,

(2) Matthew Liguori, (3) Special Agent Charles Parker, (4) Special Agent RoseMaria Marketos,

(5) Arthur Marcella, (6) Crystal Henderson, (7) Officer Robert Jaworski, (8) Special Agent Craig

Donnett, and (9) co-defendant Charles Barnes. (*See* Tr. at 3).

Additionally, the Government entered into evidence the following exhibits:  a copy of

Wants and Warrants Summary for Charles Pedoto showing entry date of February 23, 2016

(Gov. Ex. 1); a copy of a Massachusetts identification ("ID") card purportedly issued on June 15,

_____

[1] A transcript of the proceedings is filed with the Court.  (Doc. 124).  Citations to the hearing
transcript are noted as "Tr." herein.

2010, in the name of Francis P. Rosen and containing a photograph of Defendant (Gov. Ex. 2); a copy of an ID of Defendant from the Massachusetts Registry of Motor Vehicles ("DMV") (Gov. Ex. 3); a composite exhibit of copies of identifying documents obtained from a trash pull in May 2014, specifically (1) a copy of a Massachusetts driver's license, Social Security card, and birth certificate for Charles Pedoto (Gov. Ex. 4a) and (2) banking records for Charles Pedoto (Gov. Ex. 4b); and a composite exhibit of an email dated July 9, 2016 (Gov. Ex. 5a) and its attachment—a copy of the indictment (Gov. Ex. 5b).

Defendant's only witness was Special Agent Thurling, recalled for testimony after the Government completed its presentation of evidence. (Tr. at 290-91). Defendant offered no evidence. The evidence and testimony were uncontroverted. Upon review, the Undersigned finds that the testimony of the witnesses was credible.

### A.       Special Agent John Thurling

John Thurling is a Special Agent for the United States Secret Service ("Secret Service") assigned to the Fort Myers Resident Office. (Tr. at 12:22-23). Special Agent Thurling's duties include protection of the President and Vice President in addition to conducting a variety of criminal investigations such as counterfeit currency and financial fraud crimes. (*Id.* at 13). Thurling investigated Defendant Pedoto and co-defendant Barnes regarding "multiple stolen credit card numbers being used at fictitious businesses that were opened up where these cards were being swiped at point-of-sales machines, the funds were being deposited into bank accounts, and then the money was being drained from there." (*Id.* at 14:12-16).

Special Agent Thurling obtained an indictment of Defendants on May 27, 2015. (*Id.* at 15:13-14).[2] The indictment was placed under seal at the time it was returned. (*Id.* at 15:23-25).

---

[2] On request by the Government, the Court took judicial notice of this fact. (Tr. at 15:20).

The purpose of having the indictment sealed was that "one of the co-defendants [Barnes] had been investigated by us in the early 2000s, he was arrested . . . and he did have a history of flight from our agency and from law enforcement." (*Id.* at 16:5-8). Thurling stated that "[w]e were concerned, if it was not sealed, he could get wind of it, and could flee." (*Id.* at 16:8-10). Thurling testified that the Secret Service made efforts to locate both Defendants after the indictment was returned but, nevertheless, initially focused on locating Barnes because they were afraid that contacting Defendant would cause Barnes to flee. (*Id.* at 18:8-14).

During the course of the investigation, agents did not know either Defendants' location. (*See id.* at 19-21). Thurling testified that both Defendants spent time away from the Naples, Florida area. (*Id.* at 16:14). For instance, Defendant spent time in Las Vegas and later left a residence where he had a lease. (*Id.* at 16-18). Similarly, while agents conducted surveillance at Barnes' residence, sometimes as much as twice a week and observed that Barnes' wife was still at the residence, Barnes was not present. (*Id.* at 19:8-14). Additionally, agents knew that Barnes was making deposits in Las Vegas and that Barnes sailed on various cruises. (*See id.* at 19-20). Nonetheless, agents did not know either Defendants' location. (*See id.* at 19-21).

Periodically throughout the investigation, Thurling checked available databases to determine Defendant's current addresses and/or whereabouts. (*Id.* at 21). Database searches revealed Defendant had a Massachusetts driver's license and Massachusetts ID card. (*Id.* at 21:21-22). These IDs contained an old address and were not renewed at their expiration date. (*Id.*). Government's Exhibit 3 was admitted into evidence and shows information Thurling obtained from the Massachusetts State Police after the indictment was returned. (*See id.* at 22:12-17). Thurling testified that Exhibit 3 showed Defendant had a driver's license issued in 1995 with an expiration date of 2015. (*Id.* at 23-24). Thurling further testified that Exhibit 3

showed a separate Massachusetts ID was issued in 2010 with an expiration date of 2015. (*See id.* at 24:6-7). Thurling testified that the listed address was at Oakwood Avenue, Revere, Massachusetts. (*Id.* at 23:23).[3] Thurling testified that a search of Florida databases showed no Florida driver's licenses or IDs had ever been issued for Defendant. (*Id.* at 24-25).

Additionally, agents obtained other identifying documents from trash pulls conducted in May 2014. (*Id.* at 29). Government's Composite Exhibit 4a and 4b were admitted into evidence and were obtained as a result of such trash pulls. (*Id.* at 28-30). Thurling testified that Exhibit 4a included a copy of a driver's license in Defendant's name issued on January 12, 2010 with the listed address of 2 Upland Road, Winthrop, Massachusetts. (*Id.* at 30:14-20). Thurling testified that Exhibit 4b showed two additional addresses for Defendant at 4 Upland Road, Winthrop, Massachusetts and 75 Powder Mill Road, Maynard, Massachusetts. (*Id.* at 31).[4]

Eventually, co-defendant Barnes was arrested at the airport in Fort Myers, Florida on February 9, 2016. (*Id.* at 31-32). At the time of his arrest, Barnes had an ID, credit cards, and several cell phones. (*Id.* at 32:15-16). While agents believed that Barnes and Pedoto were in contact, Barnes did not provide agents with Defendant's whereabouts at the time of arrest. (*Id.* at 33). Barnes was in custody for three days after the arrest, which allowed agents to review jail calls, but agents did not learn anything about Defendant's whereabouts. (*Id.* at 34).[5]

---

[3] The listed address on both forms of identification is 71 Oakwood Avenue, Revere, Massachusetts. (*See* Gov. Ex. 3).

[4] Exhibit 4b appears to be banking records for Defendant. (*See* Gov. Ex. 4b).

[5] Regarding the jail calls, Special Agent Thurling was asked at the hearing "[w]as there any discussion about Mr. Pedoto?" (Tr. at 34:6). Thurling responded, "Mr. Barnes told someone that he had called that he had been arrested, and that both he and Charles Pedoto were on the indictment." (*Id.* at 34:7-9). Defendant objected to this statement on hearsay grounds, arguing that Mr. Barnes was listed as a witness and going to testify. (*Id.* at 34:10). The Government argued that the statement was not hearsay because it showed the effect on the listener. (*Id.* at 34:14). Specifically, the Government argued that Thurling's testimony showed that "the

The indictment was unsealed after Barnes' arrest.  (*Id.* at 35:13).  Because the indictment was unsealed, the warrant was entered into the National Crime Information Center ("NCIC") database.  (*Id.* at 35:16).  Government's Exhibit 1 was entered into evidence, and Thurling testified that the Exhibit showed the warrant was entered into the NCIC database on February 23, 2016.  (*Id.* at 36).  Thurling stated that the warrant had not been placed into the NCIC database before that time because it was sealed.  (*Id.* at 37).  Although, the NCIC database is available to any police agency, agents never received any information for Defendant from any other law enforcement agencies prior to Defendant's arrest in February 2017.  (*Id.* at 38-39).

After Barnes' arrest, agents again searched databases for current addresses for Defendant.  (*Id.* at 35:9-10).  In addition to using the NCIC database, Special Agent Thurling obtained an Accurint report that showed another possible address for Defendant in Lake Worth, Florida.  (*Id.* at 39).  Thurling provided that address to agents in the West Palm Beach office.  (*Id.* at 40).  Agents in West Palm Beach made two attempts to locate Defendant at the address, but were unsuccessful.  (*Id.* at 40).  Additionally, Thurling testified that, generally, agency policy requires agents to contact a local office for help locating persons out of area.  (*See id.* at 40-41).  Notwithstanding this policy, Thurling stopped by the Lake Worth address in April 2016 on his

---

individuals were still in contact, they were concerned that—the indictment was sealed to ensure that no one fled.  It is relevant as to how quickly the information was released that Mr. Barnes was, in fact, arrested; so it is relevant to this particular hearing before the Court."  (*Id.* at 34:19-23).  The Court reserved ruling on the hearsay objection and permitted the testimony.  (*Id.* at 34:24-35:3).  Upon review, the Undersigned sustains the hearsay objection.  Hearsay is a statement that "the declarant does not make while testifying at the current trial or hearing" and "a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  Here, the out of court statement appears to be offered by the Government for the truth of the matter asserted therein—*i.e.*, that "Mr. Barnes told someone that he had called that he had been arrested, and that both he and Charles Pedoto were on the indictment" (Tr. at 34:7-9), rather than any effect the statement had on the listener.  Therefore, the Undersigned excludes from consideration the testimony appearing at page 34, lines 7-9 in the hearing transcript.

way to an assignment to protect the President and "sat in the parking lot for approximately 40 minutes, and observed no activity, no vehicle assigned to the place." (*Id.* at 41:12-14, 44:5).

In the time after the indictment, Thurling was placed on multiple assignments requiring him to travel out of town frequently. (*Id.* at 42-43). During this timeframe, the Secret Service dealt with the 2016 presidential campaign, Republican National Convention ("RNC"), Democratic National Convention ("DNC"), United Nations General Assembly, a papal visit, and travel by the sitting President and Vice President. (*Id.* at 43). Thurling testified that "[i]t was basically an all hands on deck for that entire year. Every office was affected." (*Id.* at 43:18-19).

In addition to the attempts in Florida, Special Agent Thurling contacted agents in Massachusetts, specifically Special Agent RoseMaria Marketos, Special Agent Craig Donnett, and Special Agent Charles Parker. (*Id.* at 48-49). Believing Defendant was no longer in Florida, Thurling stated that he followed up frequently with agents in Boston. (*Id.* at 46-47). Ultimately, Defendant was arrested on February 3, 2017 at a rehabilitation facility. (*Id.* at 50). Thurling testified that he never stopped efforts to locate Defendant from indictment to arrest. (*Id.*).

On cross examination, Special Agent Thurling again testified that agents originally concentrated their efforts on Barnes because agents thought Barnes was a higher flight risk. (*Id.* at 51-53). During this time, agents made multiple database checks to pinpoint where Defendant was located. (*Id.* at 52:8-9). Nevertheless, Thurling conceded that he stated in a December 23, 2015 report that "[c]urrently, no attempts to locate and arrest Charles Pedoto have been made." (*Id.* at 52:12-13, 53:3). Thurling further conceded that, prior to Barnes' arrest, agents made no attempts physically put hands on Defendant. (*Id.* at 53-54). Moreover, the only surveillance for Defendant was conducted prior to the indictment. (*Id.* at 54).

After Barnes' arrest, Special Agent Thurling's only attempt to locate Defendant in person was his visit to the residence on his way to West Palm Beach in April 2016. (*Id.* at 54-55). Further, despite having previously accessed cell phone data that allowed agents to ping a cell phone and identify a location within a four-block area, agents never attempted to use a cell phone number believed to be Defendant to attempt to locate Defendant. (*Id.* at 55-56, 61). Similarly, while agents subpoenaed information from Bank of America related to co-defendant Barnes' bank accounts, agents never searched any of Defendant's bank records. (*Id.* at 57). For the Lake Worth address associated with Defendant, agents never contacted any utility companies, the postal inspector, or the homeowner for information. (*Id.* at 57-58). Thurling also conceded that he was unaware of any law requiring individuals to have government-issued IDs. (*Id.* at 61).

Having no luck in Florida, in May 2016, Special Agent Thurling contacted Special Agent Marketos in the Secret Service's Boston office to evaluate addresses there. (*Id.* at 60:7-8). Thurling was aware that several "drive-bys" were conducted at addresses associated with Defendant, but agents did not speak with anyone on the drive-bys nor did they surveil the addresses for activity. (*Id.* at 62-63). While contacting family members is seen by agents as a last resort, Thurling conceded that an email he sent in May 2016 indicated that Defendant may be staying with his daughter, Jamie Oppedisano. (*Id.* at 68-70). Thurling stated that he never instructed any agents in Boston to visit that property and that he was unaware of anyone going to the daughter's door and knocking on it. (*Id.* at 81-82). Moreover, Thurling never performed a separate search of records related to Defendant's daughter. (*Id.* at 71).

In June 2016, Special Agent Marketos informed Thurling that Defendant attended karaoke around town. (*Id.* at 71-72). Thurling testified, however, that it was possible that he lost

contact with Marketos for a few months based on his extensive travel and her pending career move to the FBI. (*See id.* at 65).

In August 2016, Special Agent Thurling began corresponding with Special Agent Donnett when the case was reassigned to Donnett after Marketos left the agency. (*Id.* at 65-66). Thurling testified that he was aware that Defendant had a daughter and, in fact, provided an address – 71 Oakwood in Revere – to Donnett at that time. (*Id.* at 66, 78). Donnett also informed Thurling that he located two additional addresses—2 Upland Road and 4 Upland Road, Winthrop, Massachusetts. (*Id.* at 79). Thurling believed that drive-bys were conducted at those locations. (*Id.* at 79:8). In the time period after August 2016, agents continued to perform checks but were continually pulled out on assignment. (*Id.* at 73:3-5).

Additionally, Special Agent Thurling testified that agents were aware Defendant had a Facebook page. (*Id.* at 67). Thurling conceded that he may have seen a reference to a scheduled hip surgery for Defendant on the page. (*Id.* at 67:13). Thurling further testified that he sent an email on December 2, 2016 in which Thurling stated, "[w]ith his age and health problems, I don't think he would try to evade the law. I'm pretty sure he knows he has a warrant and will not self-surrender; but if we start putting pressure on his family, I think he would see the light." (*Id.* at 67:18-22). Despite being aware of Defendant's Facebook post regarding the hip surgery, agents did not search hospital records. (*Id.* at 74). Additionally, even though Defendant received Social Security benefits, agents never contacted the agency for records. (*Id.* at 74-75).

Ultimately, Defendant was arrested at a rehabilitation facility using his own name. (*Id.* at 75). Agents found Defendant after contacting Defendant's daughter. (*Id.* at 80). The daughter was cooperative with agents. (*Id.*). Further, when Defendant was contacted by his daughter, stated, "I'm here [at the rehabilitation facility]. Come get me." (*Id.* at 75:19-21). Nonetheless,

Thurling testified that co-defendant Barnes never gave the Government any information on Defendant's whereabouts. (*Id.* at 80:6-7.)

On re-direct examination, Thurling reiterated his testimony that efforts were made to locate Defendant after co-defendant Barnes' arrest but, nevertheless, stated that agents were further motivated to find Defendant after Barnes' arrest. (*Id.* at 83.) At the time of Barnes' arrest in February 2016, a search of Barnes' cell phone showed that Pedoto and Barnes had been in contact with each other. (*Id.* at 84:21.) Additionally, prior to the trash pulls in 2014, agents observed Defendant in Naples, Florida. (*Id.* at 85.) After the trash pulls, however, agents were no longer able to locate Defendant. (*Id.*) Before Defendant's arrest on February 3, 2017, no one in law enforcement had seen Defendant. (*Id.* at 83:20.) Thurling also testified that it is unlawful to possess fraudulent identification. (*Id.* at 86:6.)

Further, Special Agent Thurling testified that the Facebook post regarding Defendant's hip surgery did not indicate a specific date, hospital, or treatment facility. (*Id.* at 86-87.) Additionally, due to HIPAA, law enforcement does not have a database to search hospital records. (*Id.* at 87:12.) Thurling testified that agents were never given any information about karaoke nights. (*Id.* at 87:17.) Further, agents did know whether Defendant's address was current because his license had expired. (*Id.* at 88:8.)

On re-cross examination, Special Agent Thurling testified that agents eventually located Defendant's daughter at the 75 Oakwood Avenue address, but he could not say whether that was "next door, two houses down, or across the street" from Defendant's address of 71 Oakwood Avenue. (*Id.* at 89:7-17.) Nevertheless, the 71 Oakwood Avenue address was available to agents "from the beginning," but agents never looked at public records to see who owned the property. (*Id.* at 90.)

On recall examination by Defendant, Thurling was asked whether a formal request to investigate – called an Investigate Other District ("IOD") – was sent to the Boston Field Office. (*Id.* at 291-93). Thurling testified that IODs were made in June 2016 and in December 2016. (*Id.*). Thurling conceded that any confusion may have been due to a breakdown in communication. (*Id.* at 292:9). On recall examination by the Government, Thurling testified that an IOD is only a mechanism to request assistance within the agency and that all three Boston agents assigned to the case understood he was asking them to locate Defendant. (*Id.* at 299-300).

### B.   Matthew Liguori

Matthew Liguori is a licensed realtor working in Naples, Florida. (Tr. at 93:9-17). Liguori helped Defendant obtain a lease in Naples in January 2013. (*Id.* at 94:8). Defendant resided in that residence for 17 months. (*Id.* at 94:12). Liguori also knew co-defendant Barnes because Barnes had accompanied Defendant to look at the leased residence. (*Id.* at 94:21-25). While Liguori got to know Defendant, he was "[n]ot really" familiar with Barnes. (*Id.* at 96:14-17). Nonetheless, Barnes eventually rented a house from Liguori in 2015. (*Id.* at 96:22).

Defendant signed a 12-month lease in 2013 and 2014, but did not complete the 2014 lease. (*Id.* at 94:14-17). Liguori learned that Defendant was not going to complete the lease in May or June 2014. (*Id.* at 95:4). At that time, Defendant informed Liguori that he was returning to Boston to visit his daughter. (*Id.* at 95:7). Although Liguori originally thought Defendant was only leaving for a visit, Defendant later called Liguori and stated that he was sick and going to stay in Boston. (*Id.* at 95). Defendant did not leave a forwarding address. (*Id.* at 95:25).

In early 2015, Liguori was contacted by law enforcement about Defendant. (*Id.* at 97:1). Liguori then called Barnes to ask what was happening regarding Defendant. (*Id.* at 98:22-24). Liguori contacted Barnes because he knew that Barnes and Pedoto were associates and because

Barnes was still in the area. (*Id.* at 99:9, 99:18). Liguori believed that Defendant was no longer in the area at this time. (*Id.* at 99:24).

On cross examination, Liguori testified that Barnes rented a different home than the one Defendant rented. (*Id.* at 101:1). Additionally, Liguori did not believe that he had any further contact with Defendant after Defendant broke the lease. (*Id.* at 101:5).

On re-direct examination, Liguori testified that he had no further dealings with Defendant in person after Defendant broke the lease. (*Id.* at 101:14). Defendant informed Liguori to keep the deposit to cover unpaid rent and that the keys were left in the house. (*Id.* at 101:14-16).

### C.     Special Agent Charles Parker

Charles Parker works as a Special Agent for the Secret Service in the Boston Field Office. (Tr. at 103). Special Agent Parker became involved in Defendant's investigation in February 2017 upon reassignment of the case from Special Agent Donnett. (*See id.* at 105).

When he received the case file, Special Agent Parker ran an Accurint report to obtain recent address information. (*Id.* at 105-106). The most recent address with activity was in Winthrop, Massachusetts. (*Id.* at 107). Parker first asked local police for any updated information, but no recent call history was reported at the address. (*Id.*). Parker then assembled a team of five or six agents to go to addresses and knock on doors. (*Id.* at 107-108).

Agents first went to the Winthrop address – 2 Upland Road – but did not come into contact with Defendant. (*Id.* at 108-110). After the unsuccessful attempt, Parker realized the report indicated that a close relative to Defendant had an address in Revere, Massachusetts, a neighboring city 20-25 minutes away. (*Id.* at 110). When agents arrived at the Revere address, agents were met by Defendant's daughter, who allowed the agents inside the home. (*Id.* at 111-12). Agents informed Ms. Oppedisano why they were there and asked if she knew where

Defendant could be located. (*Id.* at 112). The agents' supervisor, Special Agent Mitchell, requested that Ms. Oppedisano call Defendant. (*Id.* at 113). Ms. Oppedisano obliged and handed the phone to Mitchell, who spoke with Defendant. (*Id.*). Parker searched the house, but Defendant was not present. (*Id.* at 113-14).

Defendant informed Special Agent Mitchell that he was at the East Point Rehabilitation Center in Chelsea, Massachusetts. (*Id.* at 114-16). Although there are multiple rehabilitation centers in the area, Defendant provided agents with the address to the center. (*Id.* at 115-16). Two agents from the team went to rehabilitation center and arrested Defendant. (*Id.* at 117). At that time, Parker checked the NCIC database to verify that the warrant was active and notified Special Agent Thurling. (*Id.* at 117-18). Parker was not aware of any agents having had any prior conversations with Defendant prior to his arrest. (*Id.* at 118:23).

On cross examination, Special Agent Parker testified that he received the case file on February 2, 2017 and that the arrest occurred on February 3, 2017, less than 24 hours after he received the file. (*Id.* at 119, 24). Parker testified that Ms. Oppedisano was located at 71 Oakwood in Revere, Massachusetts and again stated that she was cooperative. (*Id.* at 120-21). Parker obtained Ms. Oppedisano's address from the Accurint report, not from any information left by case agents previously assigned to the case. (*Id.* at 122-23). Parker was unaware of any agents previously knocking on Ms. Oppedisano's door before that time. (*Id.* at 120-21).

On re-direct examination, Special Agent Parker clarified that the address at which he found Defendant's daughter was 75 Oakwood Avenue, not 71 Oakwood Avenue. (*Id.* at 125). Additionally, prior to February 2017, Parker stated that his office was kept busy with the presidential campaign. (*Id.* at 126). After this time, things slowed down. (*Id.*). Parker stated that was not able to check hospitals or rehabilitation centers. (*Id.* at 127-28). Further, Parker

stated that he had no reason to believe that Defendant was residing at Ms. Oppedisano's house, nor was there any indication on arrival that Defendant was living there. (*Id.* at 129).

On re-cross examination, Special Agent Parker stated that it was not possible that he wrote down the wrong address in his arrest report due to other paperwork he filled out for the arrest. (*Id.* at 130). Further, despite the discrepancy between 71 and 75 Oakwood Avenue, Parker testified that he would have checked both addresses if he had seen them in the file because both are close. (*See id.* at 131). Parker testified that it is generally a last resort to contact family members. (*Id.* at 132:8).

### D. Special Agent RoseMaria Marketos

Special Agent RoseMaria Marketos currently works as a special agent with the Federal Bureau of Investigation ("FBI") but was a Special Agent with the Secret Service in the Boston Field Office until August 2016. (Tr. at 135-36). Marketos became involved with Defendant's case in the spring of 2016 when she was given a possible address by Special Agent Thurling to look for Defendant in Winthrop, Massachusetts. (*Id.* at 136-37). Marketos was aware of the active warrant for Defendant's arrest. (*Id.* at 137).

After receiving the address, Marketos checked with the DMV, reached out to the Winthrop Police Department, and contacted the postal inspector. (*Id.* at 138-39, 142). The police department performed a local check, but the address appeared vacant. (*Id.* at 141:7-8). The postal inspector's search was negative. (*Id.* at 143:4). Marketos also went to the address but never saw any vehicles associated with Defendant. (*Id.* at 141:9, 146:13-14).

Special Agent Marketos left the Secret Service for the FBI in August 2016. (*See id.* at 143). Prior to her departure, Marketos was constantly pulled out on assignments that required

extensive travel.  (*Id.*).  Marketos was out of the office for days at a time.  (*Id.*).  Prior to her departure, Marketos only spoke to Special Agent Thurling twice.  (*Id.* at 145).

On cross examination, Special Agent Marketos testified that she first received the assignment to locate Defendant in May 2016.  (*Id.* at 148).  After she received the potential address in Winthrop, Marketos performed only two address checks less than a month apart.  (*Id.* at 148, 151).  Marketos' address checks only lasted 5-10 minutes and involved viewing the address for any vehicles, but agents never left the vehicle.  (*Id.* at 148-50).

Marketos also testified regarding her email communications with Special Agent Thurling from May to August 2016.  (*Id.* at 165-66).  One string of emails dated May 18, 2016 showed that agents were aware of Ms. Oppedisano, but Marketos does not recall performing any specific search for records for her, nor did she ever check Ms. Oppedisano's address.  (*Id.* at 154-55).

Between May 2016 and her departure in August 2016, Marketos was in another country each month.  (*Id.* at 155:13-14).  In terms of her search for Defendant, Marketos performed address checks in May 2016.  (*Id.* at 155).  In June 2016, Marketos was waiting for updated information from the Winthrop Police Department, but no agents in her office took any specific steps to locate Defendant during this time due to their busy travel schedules.  (*Id.* at 156).  In July 2016, Marketos traveled to Liberia, the RNC, and the DNC, but no agents took any specific steps to locate Defendant during this time.  (*Id.* at 157).  In August 2016, before her departure, Marketos was still on frequent protection assignments and was not at her desk long enough to attempt to locate Defendant.  (*Id.* at 158).  In sum, Marketos conceded that, other than the two address checks, she could not recall making any attempts to locate Defendant in the field.  (*Id.* at 158:1-2).

Additionally, despite having been given a phone number associated with Defendant, Marketos never attempted to use that number to attempt to locate Defendant, stating that it was Special Agent Thurling's job to make a request to obtain information for that number. (*Id.* at 159-63). Moreover, despite having access to Massachusetts DMV records, Marketos never recalled seeing any addresses in Revere, Massachusetts. (*See id.* at 167-69). Marketos conceded, however, that her memory could have faded over time. (*Id.* at 170).

### E.      Arthur Marcella

Arthur Marcella is a resident of Winthrop, Massachusetts and has lived in the area for 75 years. (Tr. at 173). Marcella has been friends with Defendant for roughly 20 years and has known co-defendant Barnes for 2-3 years. (*Id.* at 174).

Marcella was present at the airport when Barnes was arrested on February 9, 2016, but was unaware of the circumstances surrounding Barnes' arrest. (*Id.* at 175). After Barnes' arrest, Marcella informed Defendant that Barnes had been arrested. (*Id.* at 176:15). Later, on July 9, 2016, Marcella was provided a copy of the indictment as an attachment to an email sent to him by Barnes' wife. (*Id.* at 176, 178, 180).[6] After receiving the indictment, Marcella got in touch with Defendant by cell phone. (*Id.* at 179, 181). Defendant informed Marcella that he was living in a "sober house two or three towns over from where [he] reside[s]." (*Id.* at 179:24-25). Marcella did not know Defendant's address at that time, nor did he know how long Defendant had been at the sober house. (*Id.* at 181). Marcella visited Defendant at the sober house within a week or two after receiving the email. (*Id.* at 180:6-8). Once there, Marcella handed the indictment to Defendant, who told him "thank you" after receiving it. (*Id.* at 182:2-6).

---

[6] The email (Gov. Ex. 5a) and the indictment attached to the email (Gov. Ex. 5b) were admitted into evidence. (Tr. at 177-79).

Marcella testified that he was asked to provide the indictment to Defendant. (*Id.* at 182:10). Marcella, however, had no knowledge that law enforcement was looking for Defendant prior to receiving the indictment. (*Id.* at 182:17). Marcella and Defendant are Facebook friends, but Marcella does not recall any specific information about Defendant's location being posted to Facebook. (*Id.* at 183-84). Marcella was aware that Defendant had been residing at the East Point Rehabilitation Center, but he did not know the time frame. (*Id.* at 184). Marcella knows Defendant's daughter and believes Defendant was staying with her at one point, but he did not know the time frame. (*Id.* at 184). Marcella had conversations with Barnes about Pedoto after Barnes' arrest but did not recall the specifics of the conversation. (*Id.* at 185). Marcella was aware that Defendant had resided in Lake Worth, Florida and Naples, Florida. (*Id.* at 186).

On cross examination, Marcella testified that Barnes' wife was the person who asked him to deliver the indictment. (*Id.* at 187:13). Marcella did not know why she asked him to deliver the indictment to Defendant. (*Id.* at 187:22-23). Marcella's first contact with the Government was three or four weeks before the hearing. (*Id.* at 190, 192). Marcella did not know how the Government obtained the email he received from Barnes' wife. (*Id.* at 190:16). While Marcella did not have Defendant's address at any time, he had ways of getting in contact with Defendant. (*Id.* at 191). The Government never asked Marcella to serve the indictment. (*Id.* at 193:8).

On re-direct examination, Marcella testified that he was unaware of any ties that would make it easy to associate him with Defendant. (*Id.* at 194:1-3). When Barnes was arrested, Marcella did not identify himself to law enforcement. (*Id.* at 194:13).

On re-cross examination, Marcella testified that Special Agent Thurling was not aware that he knew Barnes. (*Id.* at 196:18). While Marcella and Barnes traveled to the airport

together, they were not traveling together on the same flight.  (*Id.* at 196-97).  Marcella did not

talk to agents when Barnes was arrested.  (*Id.* at 197:16).

On a final re-direct examination, Marcella testified that he and Barnes were not standing

together at the time Barnes was arrested.  (*Id.* at 197-98).

### F.    Crystal Henderson

Crystal Henderson is co-defendant Barnes' daughter.  (Tr. at 200:3).  Henderson has

known Defendant since she was 19 years old because he is a longtime friend of her father.  (*Id.* at

200:7-8).  Henderson stated that Defendant is like an uncle to her.  (*Id.* at 200:21).

Barnes contacted Henderson after his arrest to inform her that he had been arrested, but

he did not elaborate on the circumstances.  (*Id.* at 201).  Henderson was told not to worry and to

tell his friends that he was not available, not to contact him, and that he would reach out to them

if he could.  (*Id.*).  Henderson was specifically asked to reach out to Defendant and contacted

him by phone.  (*Id.* at 201:16, 202:1-3).  At that time, Defendant asked whether he was involved,

but Henderson did not know.  (*Id.* at 204:2-6).  Henderson did not know where Defendant was

living, but she believed it was Massachusetts.  (*Id.* at 200:12).  Henderson was aware, however,

that Defendant had been living in Florida prior to this time.  (*Id.* at 200:25).

At some point after the arrest, Henderson became aware that Defendant was listed in the

indictment and that there was a warrant for his arrest.  (*Id.* at 203).  While not sure of the exact

time frame, Henderson notified Defendant about the arrest warrant sometime between February

and December 2016 after seeing a Facebook post that Defendant was planning to come to

Florida.  (*Id.* at 203-204).[7]  Henderson called Defendant and told him that there was a warrant

---

[7] Defendant objected to this testimony on hearsay grounds.  (Tr. at 204:22).  The Court permitted
the testimony, but reserved ruling on the objection.  (*Id.* at 204:23 – 205:1).  The Undersigned
overrules the hearsay objection.  Specifically, Ms. Henderson's testimony is not being used to

out for his arrest and that she was "pretty sure that it was just in Florida, and that's why they didn't . . . pick him up while he was in Massachusetts." (*Id.* at 205:13-17). Henderson warned Defendant to stay away from Florida. (*Id.* at 205). Defendant, however, did not ask her any questions about the warrant. (*Id.* at 207:15).

Additionally, Henderson was aware that Defendant had two Facebook accounts and that he was more active on one account. (*Id.* at 206). While she was not aware of Defendant's privacy settings, Henderson learned from Facebook that Defendant had been in a rehabilitation center and that had been in and out of the hospital because of his hip. (*Id.*).

On cross examination, Henderson reiterated her testimony that she could not be more specific than the February to December 2016 time frame for her phone discussion with Defendant regarding the warrant. (*Id.* at 209). Federal agents never asked Henderson to contact Defendant. (*Id.* at 209:16). Henderson was first contacted by the Government about a month before the hearing. (*Id.* at 210). If she had been contacted before that time, she would have been able to provide agents the information she saw on Facebook. (*Id.* at 210). Henderson did not track Defendant's exact living arrangements but did have a phone number for him. (*Id.* at 209-10). Henderson could have provided Ms. Oppedisano's name to authorities. (*Id.* at 211).

On re-direct examination, Henderson testified that she was not assisting law enforcement, but was instead helping a friend when she contacted Defendant. (*Id.* at 212).

On re-cross examination, Henderson testified that she did not know whether Defendant heeded her advice and stayed away from Florida. (*Id.* at 213).

---

prove the content of the Facebook post but, instead, shows the effect the post had on her and the actions that she took. Thus, the statement is not hearsay. *See* Fed. R. Evid. 801(c).

### G. Officer Robert Jaworski

Robert Jaworski is a police officer for the Winthrop Police Department. (Tr. at 215). Officer Jaworski has known Defendant almost his entire life, characterizing their relationship as acquaintances and noting that he and Defendant are Facebook friends. (*Id.* at 221:5-7).

Officer Jaworski was contacted by Special Agent Marketos in the spring/summer of 2016 regarding Defendant's whereabouts. (*Id.* at 216, 219:7). Jaworski told Marketos that Defendant could be at the 2 Upland Road address or at his daughter's house in Revere. (*Id.* at 216-17, 221). Jaworski traveled to 2 Upland Road, but on arrival he realized the house had been sold. (*Id.* at 217:13-14). Jaworski testified that he is very familiar with the Winthrop area and would have known if Defendant was around town. (*Id.* at 218). Jaworski knows Defendant by sight and would have arrested him and/or notified the Secret Service if he located Defendant. (*Id.* at 218-19). Jaworski did not perform any database checks nor did he check to see who owned the home at 2 Upland Road. (*Id.* at 220-21). Jaworski was not personally aware of Defendant's location from May 2016 to February 2016. (*Id.* at 222:6).

On cross examination, Officer Jaworski reiterated that he was aware that Defendant's daughter lived in Revere, but stated that he did not know her name. (*Id.* at 222). Jaworski did not know whether he told Special Agent Marketos about Defendant's Facebook page. (*Id.* at 223:3). Jaworski did not actively assist the Secret Service, indicating that the extent of his involvement was to provide intelligence. (*Id.* at 223-24).

On re-direct examination, Officer Jaworski testified that he was comfortable saying that, from the time he was contacted by the Secret Service until Defendant's arrest, Defendant was not in Winthrop. (*Id.* at 225:4). Jaworski was unaware of Defendant's Facebook privacy settings.

(*Id.* at 225:14). Moreover, despite being friends on Facebook, Jaworski stated that he never knew where Defendant was located based on Facebook. (*Id.* at 225).

### H. Special Agent Craig Donnett

Special Agent Craig Donnett is employed with the Secret Service. (Tr. at 229). Special Agent Donnett currently resides in Dallas, Texas but was previously assigned to the Boston Field Office. (*Id.* at 228-29). Donnett became involved with locating Defendant after Special Agent Marketos left the agency. (*See id.* at 230).

Initially, Donnett was only given an email asking him to locate Defendant. (*Id.* at 230:20-21). After receiving the email, Donnett asked his investigative assistant to perform a criminal "runup," which involved looking at various law enforcement websites. (*Id.* at 231:10-11). Donnett discovered that the warrant for Defendant's arrest was still active. (*Id.* at 231:23). The runup produced two addresses, one in Winthrop and one in Revere. (*Id.* at 232). Donnett drove by the addresses on more than one occasion, but Defendant was not seen on any drive-bys. (*Id.* at 232-33). On one occasion, Donnett saw a vehicle associated with Defendant's daughter. (*Id.* at 233:17-18). Nonetheless, Donnett had no knowledge whether Defendant was living with his daughter at that time, nor did he make contact with Defendant's daughter. (*Id.* at 235).

During his time attempting to locate Defendant, Special Agent Donnett was involved extensively with protective missions during the presidential campaign. (*Id.* at 234). Donnett testified that the Secret Service was at critical staffing levels during the campaign. (*Id.* at 236).

On cross examination, Special Agent Donnett testified that he drove by the potential addresses when he returned from trips. (*Id.* at 237:18). Each time, Donnett looked for any physical activity and checked for vehicles, but Donnett spent only a few minutes at the addresses and never went to knock on any doors because he was alone. (*Id.* at 237-39).

When he was asked to locate Defendant, Donnett was not given a case file from Marketos. (*Id.* at 241). While he could not speak for other agents, Donnett typically keeps a case file of notes for the next agent. (*Id.* at 244). Here, however, Donnett essentially started his search as if Marketos had done nothing. (*Id.* at 245).

Additionally, Donnett conceded that he never followed up on any phone numbers associated with Defendant. (*Id.* at 247). Donnett also testified that he received a permanent change of station during this time that required him to be out of the office house hunting. (*Id.* at 248). Further, Donnett never spoke with Officer Jaworski, nor did he contact other law enforcement agencies or the postal inspector. (*Id.* at 248, 251). In fact, Donnett conceded that he only conducted the single background check and the drive-bys during the six months he was assigned to the case. (*Id.* at 252).

On re-direct examination, Donnett testified that locating a person is different than an investigative case in which he gathers evidence. (*Id.* at 252-53).

On re-cross examination, Donnett indicated that Ms. Oppedisano's vehicle was located in the driveway next to the address associated with Defendant. (*Id.* at 258).

## I.        Co-Defendant Charles Barnes

Charles Barnes is a co-defendant in the current criminal case. Barnes has known Defendant for 17 years and testified that he and Defendant are best friends. (Tr. at 262-63).

In regards to the current proceedings, Barnes testified that he and Defendant became aware of the trash pulls in May 2014. (*Id.* at 263). After the trash pulls, Barnes and Pedoto left Florida and traveled to Las Vegas, staying for three or four weeks in several different hotels. (*Id.* at 264). Both eventually returned to Florida, but Defendant moved out of the area to Lake Worth, Florida. (*Id.* at 265). After returning to Florida, Barnes and Pedoto stayed in contact

using prepaid "burner" cell phones because they suspected a law enforcement investigation. (*Id.* at 266-67). Barnes and Pedoto had a system of texting to check in with each other. (*Id.*). Barnes was eventually contacted by Mr. Liguori, which made Barnes suspect that law enforcement was looking for a lease and attempting to get an indictment. (*Id.* at 268-70). Barnes believes that Defendant left the Lake Worth, Florida area only after Barnes was arrested. (*Id.* at 270:20-21).

At the time of his arrest, Barnes had prepaid phones without contracts. (*Id.* at 271). After his arrest, Barnes instructed his daughter to tell Defendant, if they spoke, that he had been arrested and not to contact him because it would be a bond violation. (*Id.* at 272:3-5). Barnes testified that he had a copy of the indictment provided to Marcella because Marcella informed Barnes that Defendant did not believe he was named in the indictment. (*Id.* at 274). Barnes provided a copy to clarify that Defendant was on the indictment. (*Id.*).

Barnes believed that Defendant moved back to Massachusetts in Spring 2016 and that Ms. Oppedisano's address was 71 Oakwood Avenue. (*Id.*). Additionally, Marcella informed Barnes that Defendant had been in rehabilitation centers in Massachusetts. (*Id.* at 275). Barnes did not provide assistance to the Government prior to his plea agreement. (*Id.*).

On cross examination, Barnes testified that he wanted Defendant to know that charges were outstanding, which is why he asked his daughter, if she spoke to Defendant, to deliver the message to Defendant. (*Id.* at 280). Nonetheless, Barnes is not a Government agent. (*Id.* at 281:5). Barnes conceded that the substantial assistance provision of his plea agreement was one of the reasons leading him to testify. (*Id.* at 282). Barnes never told his daughter to tell Defendant to stay out of Florida. (*Id.*). Additionally, while Barnes was aware that his wife emailed the indictment to Marcella on his instructions, Barnes did not email the indictment himself because he was not allowed to use the internet. (*Id.* at 283).

On re-direct examination, Barnes reiterated that his actions were done to assist his friend, not to garner favor with the Government. (*Id.* at 284). Additionally, Barnes testified that he and Defendant began using burner phones because they were being cautious after the trash pulls. (*Id.* at 285). Barnes stated that Defendant should have known Barnes had been arrested based on the way the two had been communicating and the fact that their communication stopped. (*See id.* at 285-86). From the time of the indictment to his arrest, Barnes spent significant time away from Florida, including three to four months in Las Vegas and sailing on several cruises. (*Id.* at 286-87).

On re-cross examination, Barnes reiterated his testimony that the Government never asked him to provide any information to Defendant. (*Id.* at 288).

## II.     Legal Standard

The Sixth Amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial . . . ." U.S. Const. amend. VI. This speedy-trial right, however, has been described by the Supreme Court as "amorphous," "slippery," and "necessarily relative." *Vermont v. Brillon*, 556 U.S. 81, 89 (2009) (quoting *Barker v. Wingo*, 407 U.S. 514, 522-23 (1972)).

To evaluate whether a defendant's right to a speedy trial has been violated, the Supreme Court established a "balancing test" in the seminal case of *Barker v. Wingo* that weighs the conduct of both the prosecution and the defendant. *Id.* at 90 (quoting *Barker*, 407 U.S. at 529, 530). The four *Barker* factors courts must weigh are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the actual prejudice borne by the defendant. *United States v. Villarreal*, 613 F.3d 1344, 1350 (11th Cir. 2010) (citing *Barker*, 407 U.S. at 530); *see also United States v. Eguez*, No. 2:09-cr-92-FTM-

29CM, 2016 WL 6493456, at *4 (M.D. Fla. Nov. 2, 2016), *appeal dismissed sub nom.*, No. 16-17395, (11th Cir. Jan. 20, 2017).  This Undersigned addresses the four *Barker* factors in turn below.

## III.  Analysis

### A.  Length of the Delay

The first factor of the balancing test – length of the delay – actually serves as a "double enquiry."  *Villarreal*, 613 F.3d at 1350 (quoting *Doggett v. United States,* 505 U.S. 647, 651 (1992)).  First, the Supreme Court has stated that in order to trigger a constitutional speedy trial analysis under the Sixth Amendment, a defendant "must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay."  *Doggett*, 505 U.S. at 651-52.  "If, and only if, the defendant satisfies this threshold inquiry will [the court] proceed to address the remaining three factors of the Barker balancing test."  *Villarreal*, 613 F.3d at 1350.

Second, the Court must also examine "'the extent to which the delay stretches beyond the bare minimum needed' to satisfy the threshold showing of presumptive prejudice."  *Villarreal*, 613 F.3d at 1350 (citing *Doggett*, 505 U.S. at 652).  "The longer the pretrial delay extend[s] beyond the 'bare minimum' necessary to show presumptive prejudice, the stronger the presumption that the pretrial delay prejudice[s] the defendant."  *Id.* (citing *Doggett*, 505 U.S. at 655-57).  Moreover, "[t]he length of the delay itself weighs against the government, incrementally increasing in weight as the delay becomes increasingly protracted, and a particularly lengthy delay may also affect . . . analysis of the fourth Barker factor."  *Id.* (citing *Doggett*, 505 U.S. at 655-57).

"To resolve these two inquiries, [the Court] must first determine the length of the pretrial delay." *Id.* Pretrial delay is calculated from the time the Sixth Amendment right attaches (*i.e.*, an indictment) to a defendant's trial or until the pretrial motion to dismiss is determined. *See id.* The Supreme Court has noted, however, that courts generally find that a post-accusation delay is presumptively prejudicial when it approaches one year. *Doggett*, 505 U.S. at 652 n.1.

In Defendant's case, the date his Sixth Amendment right attached is May 27, 2015, the date Defendant was indicted. (Doc. 3). Defendant was arrested on February 3, 2017. (Tr. at 50). At the point of his arrest, Defendant had endured a delay of approximately twenty-one (21) months. Presently, the delay between indictment and the resolution of the pretrial motion to dismiss is more than two years. As indicated in *Doggett*, courts generally find that a delay over one year is presumptively prejudicial and triggers consideration of the remaining *Barker* factors. *See Doggett*, 505 U.S. at 652 n.1. Here, the threshold question is met because the delay of more than two years is sufficient to presume prejudice and trigger an analysis of the remaining three *Barker* factors. *See Villarreal*, 613 F.3d at 1350. Moreover, because the delay extends beyond the bare minimum to presume prejudice, this factor weighs against the Government. *See id.*

**B.      Reason for the Delay**

The next *Barker* factor is the reasons for the delay. The Government bears the burden of explaining valid reasons for the cause of the pre-trial delay. *Villarreal*, 613 F.3d at 1351 (citing *United States v. Ingram*, 446 F.3d 1332, 1336 (11th Cir. 2006)). Courts allocate different weights to different reasons for a delay. *Villarreal*, 613 F.3d at 1351. For instance, "[a] deliberate attempt to delay the trial in order to hamper the defense" will weigh heavily against the Government. *Barker*, 407 U.S. at 531. Other neutral instances, however, "such as negligence or overcrowded courts" will be weighed less heavily against the Government, but

nonetheless still against the Government because the "responsibility for such circumstances ultimately rests with the government rather than with the defendant." *Id.* "Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun." *Doggett*, 505 U.S. at 531-32. Finally, valid reasons "such as a missing witness, should serve to justify appropriate delay." *Barker*, 407 U.S. at 531.

It is important to note that "a defendant has no duty to bring himself to trial; the [Government] has that duty." *Barker*, 407 U.S. at 527. Nevertheless, a "defendant who intentionally evades the Government's efforts to bring him in to trial is culpable in causing the delay." *Ingram*, 446 F.3d at 1337. Conversely, however, "the government's failure to pursue a defendant diligently will weigh against it, more or less heavily depending on if the government acted in good or bad faith." *Villarreal*, 613 F.3d at 1351.

A review of the case law shows that courts allocate weight for this *Barker* factor differently based on the various reasons for a delay.

For example, when the reason for the delay is a defendant's willful evasion of police efforts, this factor weighs in favor of the Government. *See Villarreal*, 613 F.3d at 1344. In *United States v. Villarreal*, the defendant claimed that the ten-year delay between the indictment and his arrest violated his constitutional right to a speedy trial. *Id*. at 1348. The district court found no violation of that right, specifically finding that the reason for the delay weighed in favor of the Government. *Id*. at 1352. The Eleventh Circuit affirmed, explaining that the reason for the delay was the defendant's evasive tactics to impede the Government's efforts to arrest him. *Id*. at 1353. Specifically, immediately after the defendant was indicted, federal agents

surveyed properties connected with him. *Id.* An informant revealed, however, that the defendant had fled to Mexico. *Id.* The court found that the defendant had made substantial efforts to evade police. *Id.* The court, therefore, weighed the reason for the delay in favor of the Government. *Id.* Of note, however, while this factor weighed against the defendant, the court declined to give this *Barker* factor much weight because there were gaps in the Government's effort to locate the defendant. *Id*.

In contrast, when the reason for the delay is solely attributable to the Government's failure of diligent pursuit, this factor will weigh heavily against the Government. *Ingram*, 446 F.3d at 1334. In *United States v. Ingram*, the defendant claimed that his speedy trial rights were violated by a two-year delay. *Id.* The district court found that that the defendant's speedy trial rights were not violated, but the Eleventh Circuit reversed. *Id*. at 1340. The Eleventh Circuit found that the district court erred in attributing the reason for the delay to the defendant. *Id.* at 1337. The court noted that the district court made no finding that the defendant willfully evaded the police. *Id.* Additionally, the court stated that there was no evidence that the defendant knew of the indictment or arrest warrant. *Id.* In fact, the court specifically noted that there was no evidence that the defendant even suspected he might be arrested. *Id*. at 1337. Additionally, the defendant had made affirmative steps to contact officers and voluntarily surrendered as soon as he learned of the indictment and the arrest warrant. *Id*. at 1338. The court held that the defendant's actions were inconsistent with willful evasion and that there was no reasonable explanation for the Government's neglect in executing the warrant. *Id*. at 1338-39. Thus, the court found that reason for the delay was attributable to the Government's failure to pursue the defendant diligently and weighed the factor heavily against the Government. *Id*.

Similarly, when the Government does not engage in a good-faith effort to locate a defendant, this factor will weigh heavily against the Government. *See United States v. Dennard*, 722 F.2d 1510 (11th Cir. 1984). In *Dennard*, the defendants were charged in drug-related offenses, and the indictment had been sealed since it was returned. *Id.* at 1511. The indictment was eventually unsealed over fifteen months later. *Id.* Although the Government argued that the delay was necessary to avoid alerting fugitive defendants, the Eleventh Circuit affirmed the district court's finding that the Government was not engaged in a good-faith investigative effort during the delay. *Id.* at 1513. Due to the lack of a good-faith effort during the delay, the court concluded that the reason for the delay weighed heavily against the Government. *See id.*

Further, when the Government is negligent in its pursuit of a defendant, this factor weighs against the Government. *See United States v. Clark*, 83 F.3d 1350 (11th Cir. 1996). In *Clark*, the defendant alleged a violation of his Sixth Amendment right to a speedy trial after a post-indictment delay of seventeen months. *Id.* at 1352. There, the Government conceded that the reason for the delay was solely attributable to its negligence. *Id.* The court noted that there was no evidence that the defendant attempted to evade police because the defendant had resided in the same apartment and was taking classes at the same local university before and after the indictment. *Id.* at 1352. Further, the police did not actively search for the defendant during the delay because they erroneously assumed the U.S. Marshal's office planned to arrest him. *Id.* The only attempt to locate the defendant prior to the date of his arrest was made by a city police officer who testified that no one answered when he knocked on the defendant's apartment door. *Id.* Because the Government failed to act with diligence in pursuing the defendant, the court found that this factor weighed against the Government. *Id.* at 1353.

Finally, if the Government takes reasonable and diligent steps to locate a defendant, then, at worst, this is a neutral reason for a delay. *See United States v. Lamar*, 562 F. App'x 802, 805 (11th Cir. 2014). In *Lamar*, the defendant alleged a violation of his right to a speedy trial after a forty-two month delay between indictment and arrest. *Id*. The district court found that the second *Barker* factor was neutral, and the Eleventh Circuit affirmed. *Id*. The court stated that the government took reasonable and diligent steps to locate the defendant, including running comprehensive database checks and speaking with his mother. *Id*. Additionally, the evidence suggested that the defendant likely knew he was being investigated and took efforts to remain inconspicuous because several co-conspirators had already been arrested. *Id*. The court found that the defendant's "choice to lead a life making him extraordinarily difficult to find, was, at worst, a neutral reason for delay." *Id.*

In the current case, there are multiple periods of delay and multiple reasons for the delay between the indictment and the present.

**The First Period of Delay**

The first period of delay in Defendant's case is the time between the return of the indictment on May 27, 2015 and co-defendant Barnes' arrest in February 2016. For this period of time, the evidence from the hearing demonstrates that the Government did not make any attempts to arrest Defendant. Specifically, Special Agent Thurling testified at the hearing that "one of the co-defendants [Barnes] had been investigated by us in the early 2000s, he was arrested by us, and he did have a history of flight from our agency and from law enforcement." (Tr. at 16:5-8). Based on this history, Thurling stated that agents were concerned that, if the indictment was not sealed, Barnes "could get wind of it, and could flee." (*Id.* at 16:8-10). Thurling further stated that agents were initially focused on Barnes because they were afraid that,

if they contacted Defendant, then Barnes would flee. (*Id.* at 18:11-14). While Thurling testified that the Secret Service made efforts to locate both Defendants after the indictment, (*id.* at 18:8), he nevertheless conceded that he authored a December 23, 2015 report stating "[c]urrently, no attempts to locate and arrest Charles Pedoto have been made." (*Id.* at 52:12-13, 53:3). Moreover, the Government failed to present any evidence that agents made any attempts to put hands on Defendant and physically arrest him before Barnes' arrest. (*See, e.g.*, *id.* at 52-53). Thus, based on the evidence presented at the hearing, the Undersigned finds that the Government sought to delay Defendant's arrest because it was afraid that Defendant's arrest would cause co-defendant Barnes to flee.

This type of delay is similar to the delay in *Dennard*, 722 F.2d at 1513. Here, as in *Dennard*, the Government's inaction in attempting to locate the Defendant was based on a fear of alerting a co-defendant. *See id.* In *Dennard*, the court affirmed the district court's finding that the Government was not engaged in a good-faith investigative effort during the delay and weighed this factor heavily against the Government. *See id.* Similarly, here, the Government's inaction supports a finding that the Government did not make a good-faith effort to find Defendant during the time period from the return of the indictment on May 27, 2015 to co-defendant Barnes' arrest in February 2016. *See id.* Accordingly, the Undersigned finds that this period of delay weighs heavily against the Government. *See id.*

**The Second Period of Delay**

The second period of delay in this case is from co-defendant Barnes' arrest in February 2016 to Defendant's arrest in February 2017. For this period of delay, it is necessary to evaluate closely what occurred during this time.

Immediately after co-defendant Barnes' arrest, the indictment was unsealed and Defendant's arrest warrant was recorded in the NCIC database. (Tr. at 35; Gov. Ex. 1). Additionally, Special Agent Thurling requested assistance from agents in the West Palm Beach office to check an address in Lake Worth, Florida. (Tr. at 39-40). Agents made checks of this residence, but to no avail. (*See id.*). In April 2016, Thurling stopped by the Lake Worth address for forty minutes on his way to an assignment. (*Id.* at 41).

In May 2016, Thurling contacted Special Agent Marketos in Boston to attempt to locate Defendant. (*Id.* at 148, 151). Marketos checked the local DMV for records, contacted a local police officer, and contacted the postal inspector. (*Id.* at 138-41). Nonetheless, between May 2016 and her departure from the Secret Service in August 2016, Marketos only physically went to physical addresses on two occasions, staying less than ten minutes each time and never leaving her vehicle. (*Id.* at 148-50). Further, despite his extensive knowledge of the area, the officer that Marketos contacted – Officer Jaworski – only provided intelligence and a single drive-by of the address in Winthrop. (*Id.* at 218, 223). Moreover, it appears that Marketos was personally distracted by her impending career move the FBI. (*See id.* at 158).

In August 2016, the case was reassigned to Special Agent Donnett when Special Agent Marketos left the Secret Service for the FBI. (*Id.* at 135, 229). When Donnett received the assignment to locate Defendant, he essentially started from scratch because Marketos did not leave a case file. (*Id.* at 245). Donnett searched databases and performed a background check. (*Id.* at 232). Nevertheless, from August 2016 to February 2017, Donnett only performed four to five drive-bys, totaling roughly forty-five minutes. (*Id.* at 252). Donnett never spoke to Officer Jaworski or with other law enforcement agencies, nor did he contact the postal inspector. (*Id.* at

248, 251). Moreover, it appears that Donnett also was distracted personally by an impending relocation to the Dallas, Texas office. (*See id.* at 248).

The case was reassigned to Special Agent Parker on February 2, 2017 after Special Agent Donnett moved to Texas. (*Id.* at 105, 229). Upon receiving the assignment, Parker ran a report that generated an address in Winthrop. (*Id.* at 107). Parker gathered a team of agents who went to the address, but they were unsuccessful. (*Id.* 108-10). Parker then realized that the report also had an address for Defendant's daughter. (*Id.* at 111). When agents arrived at that other location, Defendant was not present, but Defendant's daughter was. (*Id.*). Defendant's daughter was cooperative and called Defendant at the agents' request. (*Id.* at 113). Agents then spoke to Defendant, telling agents to come get him at the nearby rehabilitation center. (*Id.* at 75, 114-16). Defendant was arrested on February 3, 2017, less than 24 hours after Parker received the assignment. (*Id.* at 119, 24).

During this period of time, the record shows that all of the agents assigned to the case in Boston were aware of Defendant's daughter. (*Id.* at 69, 113, 154, 233). In fact, the record shows that the Secret Service was aware of Defendant's daughter by at least May 2016. (*Id.* at 69). Nevertheless, agents made no attempts to contact Defendant's daughter until February 3, 2017. (*Id.* at 113). Further, while Thurling and Parker testified that contacting a family member is a last resort, the record shows that Parker went to the daughter's house immediately after his unsuccessful first attempt. (*Id.* at 68, 113, 132).

Additionally, from Barnes' arrest in February 2016 to Defendant's arrest in February 2017, the Secret Service agents assigned to locating Defendant traveled extensively, primarily due to the presidential campaign. (*Id.* at 42-43, 126-27, 144, 234). Special Agent Thurling testified that he was continually pulled out on assignment. (*Id.* at 73). Special Agent Marketos

testified that she was out of the country each of the four months she was assigned to the case. (*Id.* at 155). In fact, Marketos conceded that, during this time, she was not at her desk long enough to search for Defendant. (*Id.* at 158). Similarly, Special Agent Donnett stated that, during the time he was assigned to the case, he traveled extensively and that the Boston office was at critical staffing levels. (*Id.* at 234-36). Special Agent Parker testified that it was February 2017 before things slowed down. (*Id.* at 126).

Despite the agents' busy schedules, the Government also presented significant evidence suggesting that Defendant knew he was under investigation and took steps to remain inconspicuous during the course of the investigation. For instance, Defendant did not reside in the same residence continually. (*See id.* at 94, 264). After agents conducted trash pulls in 2014, Defendant left the area, traveling to Las Vegas and breaking a lease on his residence. (*Id.*). Defendant eventually moved to Lake Worth, Florida and later to Massachusetts. (*See id.* at 179, 265). Additionally, Defendant never updated his Massachusetts driver's license or ID, letting them expire in 2015, and never obtained a Florida license. (*Id.* at 22-25). Moreover, despite his frequent moves, Defendant never left a forwarding address. (*See id.* at 95).

The case of *United States v. Lamar* is instructive. *See* 562 F. App'x at 805. In *Lamar*, the court found that reasonable steps by the Government to find the defendant included running comprehensive database checks and speaking with a family member of the defendant—his mother. *Id.* Here, like *Lamar*, it appears that the Government ran comprehensive database checks and also recorded Defendant's arrest warrant in the NCIC database. *See id.* Unlike *Lamar*, however, where law enforcement spoke to the defendant's family member, the agents here did not speak to Defendant's daughter until February 2017, despite knowing of her existence and her address by May 2016. *See id.* While Special Agent Thurling and Special

Agent Parker testified that contacting family members is a last resort, these statements are undercut somewhat by the fact that Parker contacted Defendant's daughter almost immediately on the first (and only) day he searched for Defendant. (*See* Tr. at 112, 132). As such, the Government has not shown that it could not have contacted Defendant's daughter at some earlier time, a seemingly simple step that ultimately led to Defendant's arrest. Thus, unlike *Lamar*, because the Government did not contact Defendant's family member, the Undersigned finds that the Government's actions were not reasonable and diligent under the circumstances. *See* 562 F. App'x at 805.

Additionally, even the most generous review of the Secret Service agents' actions during the time from Barnes' arrest to Defendant's arrest shows a degree of negligence by the Government. As the Eleventh Circuit stated in *United States v. Clark*, when the Government is negligent in their pursuit of a defendant, this factor weighs against the Government. *See* 83 F.3d at 1353. In *Clark*, the court found that the Government's actions were negligent because police did not actively search for the defendant assuming that the U.S. Marshal's office planned to arrest him and because the only attempt to locate the defendant prior to the date of his arrest was made by a city police officer who testified that no one answered when he knocked on the defendant's apartment door. *Id*. In this instance, there is no evidence that agents even made the minimal attempt to knock on a door. In fact, it appears that the only time agents ever knocked on any doors or attempted to put hands on Defendant was the day he was arrested.

Furthermore, the record shows that there was a lack of effective communication among agents that caused delays in attempting to locate the Defendant. For instance, Special Agent Thurling conceded that he may have lost contact with Special Agent Marketos for a few months due to his extensive travel. (*Id.* at 65). Thurling also appeared to concede that there was

confusion surrounding whether he submitted a formal IOD request to Boston and further indicated that the confusion may have been caused due to a breakdown in communication. (Tr. at 292).

Additionally, the record shows that this matter was handed off from one agent to the next, sometimes with minimal prior information being provided to the new agent. (*See* Tr. at 104, 230, 244). For instance, Special Agent Donnett testified that Special Agent Marketos did not leave him a case file at all and that he essentially started his search for Defendant from scratch. (*See id.* at 244-45). As a result, Donnett was not privy to what Marketos had previously done, including her conversations with Officer Jaworski. (*See id.*). In fact, Donnett testified that he never contacted Officer Jaworski, (*id.* at 248), who actually knew Defendant and the local community in Massachusetts well, (*id.* at 218).

In sum, the time and attention of the agents charged with locating the Defendant appear to have been stretched thin by the demands of other important duties and, to a lesser extent, distractions associated with career moves. (*See id.* at 144-45, 248). Defendant cannot be held responsible for the Government's negligence resulting from the agents' lack of diligence in pursuing the Defendant. *See Clark*, 83 F.3d at 1353. Thus, the Government's negligence in this regard must be weighed against the Government. *See id.*

Despite the Government's negligence, as in *Lamar*, the evidence here also suggests that Defendant likely knew he was being investigated and that he made efforts to remain inconspicuous. *See* 562 F. App'x at 805. Specifically, it appears that Defendant knew he was being investigated and made himself harder to find by moving frequently, failing to obtain a new driver's license, failing to update his licenses, and failing to provide forwarding addresses. (*See* Tr. at 22-27, 95). In *Lamar*, the Eleventh Circuit held that the defendant's "choice to lead a life

making him extraordinarily difficult to find, was, at worst, a neutral reason for delay." 562 F. App'x at 805. In the present case, the Undersigned finds that Defendant made life choices that rendered him inconspicuous and extraordinarily difficult to find. *See id.* As a result, the Undersigned finds that this period of delay is, at worst, neutral in terms of responsibility. *See id.* Nevertheless, even neutral reasons weigh against the Government. *See Doggett*, 505 U.S. at 531-32.

Furthermore, while the Government argued at the hearing that Defendant's actions were tantamount to willful evasion, (Tr. at 308), the record does not support a finding of willful evasion here. *See Villarreal*, 613 F.3d at 1353. Defendant actively maintained Facebook accounts, posting that he was having hip surgery and that he was planning to take a trip to Florida. (Tr. at 67, 204). Moreover, Special Agent Thurling testified that agents were aware that Defendant may have been attending karaoke nights in Massachusetts. (*Id.* at 71-72). The record also shows that Defendant checked into a rehabilitation facility under his own name. (*Id.* at 75). Furthermore, even Special Agent Thurling opined in his December 2, 2016 email communication that "[w]ith [Defendant's] age and health problems, I don't think he would try to evade the law." (*Id.* at 67:18-19). Based on this evidence, the Undersigned cannot find that Defendant's actions rise to the level of willful evasion.

Moreover, the Undersigned notes that in *Villarreal*, the Eleventh Circuit declined to give the second *Barker* factor much weight because there were gaps in the Government's search for the defendant. *See Villarreal*, 613 F.3d at 1353. Here, the evidence shows that there were substantial gaps in the Government's search for Defendant. Stated differently, even if Defendant was actively evading law enforcement, many *months* passed where – due to the presidential campaign and other assignments – the Government was not searching for Defendant at all.

Although the agents' other work was undoubtedly important, the Defendant cannot be held responsible for the Government's failure to search for him during these periods. Thus, due to the gaps in search, even if this factor could be weighed against Defendant, it would not weigh heavily against him. *See id.* Regardless, the Undersigned declines to find that Defendant was willfully evading authorities. Accordingly, the Undersigned finds that the period of delay from Barnes' arrest to Defendant's ultimate arrest, weighs against the Government.

### The Third Period of Delay

After Defendant's arrest, the final period of delay in Defendant's case is the short delay from the arrest to the present proceedings. The Undersigned finds that the reason for this delay is neutral in terms of responsibility, but even neutral reasons weigh against the Government. *See Doggett*, 505 U.S. at 531-32.

In evaluating the various reasons for the delay, the Undersigned finds that the first period of delay – from the date of the indictment on May 27, 2015 to co-defendant Barnes' arrest in February 2016 – is due to the Government's decision not to pursue Defendant for fear of alerting Barnes. The Undersigned weighs this reason heavily against the Government. *See Dennard*, 722 F.2d at 1513. For the next period of delay – from Barnes' arrest in February 2016 to Defendant's arrest in February 2017 – the Undersigned finds that this period of delay is due to the Government's negligence and Defendant's choice to lead a life making him inconspicuous and extraordinarily difficult to find—both neutral reasons that weigh against the Government. *See Lamar*, 562 F. App'x at 805. For the final period of delay – from Defendant's arrest to the present proceedings – the Undersigned finds that the reason for this delay is neutral but, nonetheless, weighs against the Government. *See Doggett*, 505 U.S. at 531-32. In sum, because

the reasons for the delay are attributable to the Government, the Undersigned finds that the second *Barker* factor weighs against the Government.

Turning to the weight given to this factor, the facts of this case appear to be analogous to *United States v. Ingram*, 446 F.3d at 1334. In *Ingram*, the defendant's actions were found to be inconsistent with willful evasion and there was no reasonable explanation for the Government's neglect in executing the warrant. *Id*. at 1338-39. As a result, the Eleventh Circuit found that reason for the delay was attributable to the Government's failure to pursue the defendant diligently and, therefore, weighed the second *Barker* factor heavily against the Government. *Id.* Similarly, here, because there is no evidence of willful evasion and because the reasons for the delay are primarily attributable to the Government's failure to pursue Defendant diligently, the Undersigned weighs this factor heavily against the Government. *See id.*

### C.    Assertion of the Speedy Trial Right

The next factor is Defendant's assertion of the speedy-trial right. The Eleventh Circuit has stated that "[a] defendant's assertion of his speedy trial right is often 'entitled to strong evidentiary weight in determining whether a defendant is being deprived of the right.'" *Villarreal*, 613 F.3d at 1354 (citing *Barker*, 407 U.S. at 531-32). The reason for this is "because a timely demand for a speedy trial often supports an inference that the defendant was not at fault for the delay and that the delay prejudiced the defendant." *Id.* (citing *Barker*, 407 U.S. at 531).

Nevertheless, "the weight attached to a defendant's assertion of his speedy trial right will differ with the circumstances of the defendant's demand." *Id.* (citing *Barker*, 407 U.S. at 528-29). For instance, when a defendant knows of the charges against him but fails to demand a speedy trial during the delay from his indictment to his arrest, this factor weighs heavily against the defendant. *See Villarreal*, 613 F.3d at 1355. Conversely, however, if a defendant is unaware

that charges are pending against him, then this factor may weigh heavily against the Government. *See Ingram*, 446 F.3d at 1338; *see also Eguez*, 2016 WL 6493456, at *8.

In *Villarreal*, for example, the Eleventh Circuit found that this factor weighed heavily against the defendant because the defendant knew of the charges against him but failed to demand a speedy trial during the ten-year delay from indictment to arrest. 613 F.3d at 1354. The court stated that the defendant's "failure to assert his right in any manner until after his arrest will make 'it difficult for [him] to prove that he was denied a speedy trial.'" *Id.* at 1355 (citing *Barker*, 407 U.S. at 532).

Conversely, in *Ingram*, the Eleventh Circuit weighed this factor heavily against the Government because the defendant asserted his right to a speedy trial soon after learning of the indictment and arrest warrant. 446 F.3d at 1338.

Similarly, in this Court's decision in *United States v. Eguez*, the Court weighed this factor heavily against the Government because there was a lack of evidence that defendant knew he had been indicted and because the motion was timely filed. 2016 WL 6493456, at *8.

In the present case, Defendant filed the present Motion roughly three months after his arrest in May 2017. There is no indication that Defendant's Motion was filed untimely. *See id.* Additionally, there is no record evidence that Defendant knew of the existence of the indictment before co-defendant Barnes' arrest in February 2016.

After Barnes' arrest, however, the situation plainly changed. The Government presented evidence from two witnesses who testified that they informed Defendant charges were outstanding against him. Specifically, Arthur Marcella specifically testified that he handed a copy of the indictment to Defendant in July 2016. (Tr. at 182:2). Additionally, Crystal Henderson, co-defendant Barnes' daughter, testified that – at some point between February 2016

and December 2016 – she called Defendant and informed him that he was named in the indictment and that there was a warrant for his arrest. (*Id.* at 203-205). Based on this testimony, the Undersigned finds that Defendant knew of the indictment by at least July 2016. Nevertheless, Defendant did not assert his speedy trial rights immediately after learning of the charges but, instead, waited until after he was arrested.

Because Defendant knew of the charges against him beginning in July 2016 and failed to assert his speedy trial right until the filing of the present Motion in May 2017, this factor weighs against him. *See Villarreal*, 613 F.3d at 1355. Nevertheless, the Undersigned finds that this factor does not weigh against Defendant heavily.

### D. Prejudice to Defendant

The final factor is prejudice to Defendant—specifically, the extent to which Defendant suffered actual prejudice from the delay. *See Villarreal*, 613 F.3d at 1355. On this point, if the first three *Barker* factors do not weigh heavily against the Government, then a defendant generally must demonstrate actual prejudice to succeed on a speedy trial claim. *Id.* (citing *United States v. Dunn,* 345 F.3d 1285, 1296 (11th Cir. 2003)). Courts "assess the prejudice suffered by the defendant in light of the three interests of the defendant the speedy trial right was intended to protect: (1) 'to prevent oppressive pretrial incarceration;' (2) 'to minimize anxiety and concern of the accused;' and (3) 'to limit the possibility that the defense will be impaired.'" *Id.* (citing *Barker*, 407 U.S. at 532).

Additionally, courts consider the length of the delay in evaluating prejudice. *Id.* Specifically, as indicated above regarding the first *Barker* factor, "[t]he length of the delay itself weighs against the government, incrementally increasing in weight as the delay becomes increasingly protracted, and a particularly lengthy delay may also affect . . . *analysis of the fourth*

*Barker factor.*" *Id.* (citing *Doggett*, 505 U.S. at 655-57; emphasis added). Nevertheless, it is unclear how long a delay must be to affect the analysis of the fourth *Barker* factor. *See Clark*, 83 F.3d at 1354. The Eleventh Circuit has stated that "there is no hard and fast rule to apply" and "each case must be decided on its own facts" in determining whether a delay is sufficiently long enough to find that a defendant need not show actual prejudice resulting from the delay. *Id.* Nonetheless, in cases where the delay is long enough, courts may make a finding that the presumptive prejudice is so prejudicial to the defendant that this final *Barker* factor will weigh heavily against the Government even though a defendant may not have any evidence of actual prejudice. *See Eguez*, 2016 WL 6493456, at *9.

Because the first three *Barker* factors do not all weigh heavily against the Government here, the Court must address (1) whether Defendant suffered actual prejudice and/or (2) whether the length of the delay is long enough to establish sufficient presumptive prejudice such that no showing of actual prejudice is required.

### 1.    *Actual Prejudice*

The three interests courts assess in determining actual prejudice are: (1) oppressive pretrial incarceration; (2) anxiety and concern of the accused; and (3) the impairment of the defense. *Villarreal*, 613 F.3d at 1355. Here, Defendant does not and cannot argue that he suffered actual prejudice on the bases that he was subjected to oppressive pretrial incarceration or that he suffered anxiety and concern. *See Villarreal*, 613 F.3d at 1355. Defendant was not incarcerated prior to his arrest and he has been on pre-trial release since his arrest. Moreover, Defendant does not argue that he suffered "anxiety and concern" because Defendant contends that he was not aware of the indictment. (Doc. 98 at 7). Thus, the issue here is whether Defendant's defense has been impaired. *See Villarreal*, 613 F.3d at 1355.

On this point, the inability of a defendant to adequately prepare his case is the most serious interest courts assess for actual prejudice because it "skews the fairness of the entire system." *Barker*, 407 U.S. at 532.  Courts have noted, however, that impairment of one's defense is extremely difficult to prove.  In *Barker*, the Supreme Court noted that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because the erosion of exculpatory evidence and testimony "can rarely be shown."  407 U.S. at 532.  Similarly, in *Doggett*, the Supreme Court stated "we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify."  505 U.S. at 655.

Defendant argued at the hearing that he is prejudiced by faded memories of witnesses.  (Tr. at 321-22).  Such a conclusory allegation is not sufficient to establish actual prejudice.  In *United States v. Machado*, for example, this Court found that the ability to raise specific defenses, to procure necessary defense witnesses, and to elicit specific testimony were insufficient to establish actual prejudice.  *See* No. 2:10-cr-48-FTM-29CM, 2016 WL 2758884, at *5 (M.D. Fla. May 12, 2016).  Likewise, in both *Villarreal* and *Clark*, the inability to locate witnesses was insufficient to establish actual prejudice.  *See Villarreal*, 613 F.3d at 1356; *Clark*, 83 F.3d at 1354.  Similarly, here, the Undersigned finds that Defendant's concern regarding the faded memories of witness – *i.e.*, the ability to have witnesses elicit specific testimony – is insufficient to establish prejudice.  *See Machado*, 2016 WL 2758884, at *5.

Defendant also argues that he suffered prejudice because "he was not provided with the opportunity to provide information about [co-defendant] Barnes' involvement that might have assisted him in plea negotiations."  (Doc. 98 at 7-8).  Nonetheless, Defendant did not cite any specific authority for this proposition.  (*See id.*).  Moreover, other courts have determined that

"[a] weakened plea bargaining position is not the type of prejudice protected by the Sixth Amendment." *United States v. Beamon*, 992 F.2d 1009, 1014 (9th Cir. 1993). In *Beamon*, the Ninth Circuit stated that "a diminished plea bargaining position does not amount to impairment of defense" because "[w]hether the prosecutor would have agreed to a lower sentence, or the court would have approved it, without the delay is speculation." *Id.* The court found that because the possibility of a better plea bargain was speculative, it was insufficient to show actual prejudice. *See id.* at 1015. Similarly, here, the Undersigned finds Defendant's stated concern that he does not have the opportunity to provide information about co-defendant Barnes for purposes of plea negotiations is speculative and, therefore, insufficient to show actual prejudice. *See id.*

### 2. Length of the Delay and Presumptive Prejudice

As indicated above, delays over one year are presumptively prejudicial such that an analysis of the final three *Barker* factors is triggered. *See Doggett*, 505 U.S. at 652 n.1. Nevertheless, delays over one year do not automatically prevent defendants from having to demonstrate actual prejudice for the fourth *Barker* factor. *See Clark*, 83 F.3d at 1352.

In *Clark*, for example, the Eleventh Circuit held that the district court erred by not requiring the defendant to show actual prejudice after a delay of only seventeen months. *Id.* at 1354. Specifically, the court held that although the defendant was entitled to a presumption of prejudice for the first *Barker* factor for the seventeen-month delay, the defendant nevertheless retained the burden of proving the remaining *Barker* factors. *Id.* at 1352. In evaluating the fourth *Barker* factor, the court noted that the defendant's seventeen-month delay was much less than the 8.5 year delay in *Doggett* and much closer to the 14.5 month delay in another case, *Robinson v. Whitley*, 2 F.3d 562, 570 (5th Cir. 1993), where the court required the defendant to

show actual prejudice.  *Clark*, 83 F.3d at 1354.  The court noted that "there is no hard and fast rule to apply" and that "each case must be decided on its own facts" in determining whether a defendant must show actual prejudice.  *Id.*  Nonetheless, upon the facts of that case, including a delay of only seventeen months, the court found that the defendant was required to show actual prejudice resulting from the delay.  *Id.*

On the other end of the spectrum, however, is this Court's decision in *Eguez*, 2016 WL 6493456, at *8.  In *Eguez*, the Court specifically found that "[t]he evidence at the evidentiary hearing did not establish any actual prejudice to defendant from the delay."  *Id.*  Nevertheless, due to the length of the delay – *i.e.*, more than six years – the Court found that there was sufficient presumptive prejudice to the defendant and, therefore, weighed this factor heavily against the Government.  *Id.* at *9.

Upon review of the facts of this case, the delay here of roughly two years does not support a finding that the delay was so long as to be presumptively prejudicial such that Defendant need not show actual prejudice.  *See Clark*, 83 F.3d at 1352.  Specifically, the roughly two-year delay here is similar to the seventeen-month delay in *Clark* where the court required the defendant to show actual prejudice.  *See id.*  Moreover, the current delay is certainly not anywhere near as long as the six-year delay in *Eguez* where the Court found that the defendant was presumptively prejudiced by that delay.  *See Eguez*, 2016 WL 6493456, at *8.  Accordingly, the Defendant here is required to demonstrate actual prejudice.  *See Clark*, 83 F.3d at 1354.  He has failed to do so.

### 3.     *Weight of the Fourth Barker Factor*

In sum, Defendant has not demonstrated actual prejudice or presumptive prejudice.  The Eleventh Circuit has indicated that an insufficient showing of prejudice may be weighed heavily

against a defendant. *See Villarreal*, 613 F.3d at 1357. Here, because there is no evidence that Defendant was prejudiced, the Undersigned weighs this factor heavily against Defendant. *See id.*

### E. Weighing the Factors

After evaluating each of the factors individually, the Court must balance the four *Barker* factors. *Villarreal*, 613 F.3d at 1357. First, the length of the delay weighs against the Government. Second, the reason for the delay weighs heavily against the Government. Third, the assertion of the speedy trial right weighs against Defendant, but not heavily. Finally, the prejudice from the delay weighs heavily against Defendant. Taken together, the result of the *Barker* analysis is essentially split. Nevertheless, when the first three factors do not weigh heavily against the Government, the Eleventh Circuit has indicated that defendants must show actual prejudice. *See Villarreal*, 613 F.3d at 1355. Here, however, Defendant has not adequately demonstrated actual prejudice. Accordingly, Defendant's Motion to Dismiss Indictment (Doc. 98) should be denied.

## IV. Conclusion

Based on the evidence presented at the hearing and after weighing the four *Barker* factors together, the Undersigned **RESPECTFULLY RECOMMENDS** that Defendant's Motion to Dismiss the Indictment (Doc. 98) be **DENIED**.

Respectfully recommended in Chambers in Fort Myers, Florida on August 15, 2017.

_____
MAC R. MCCOY
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

Copies furnished to:

Counsel of Record
Unrepresented Parties